# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 20-8637

EMILIO ESTEVEZ , APPELLANT,

V.

DENIS MCDONOUGH,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued October 6, 2022                                    Decided May 19, 2023)

*Kent A. Eiler*, with whom *John Niles* was on the brief, both of Topeka, Kansas, for the appellant.

*Timothy G. Joseph*, with whom *Richard A. Sauber*, General Counsel; *Mary Ann Flynn*, Chief Counsel; and *Anna Whited*, Deputy Chief Counsel, all of Washington, D.C., were on the brief for the appellee.

Before BARTLEY, *Chief Judge*, and PIETSCH and LAURER, *Judges*.

BARTLEY, *Chief Judge*: Veteran Emilio Estevez appeals through counsel a July 23, 2020, Board of Veterans' Appeals (Board) decision that denied entitlement to disability evaluations greater than 20% for right shoulder and left knee disabilities and greater than 10% for lichen planus prior to February 8, 2016. Record (R.) at 5-30.[1] This appeal, over which the Court has jurisdiction pursuant to 38 U.S.C. §§ 7252(a) and 7266(a), was referred to a panel of the Court, with oral argument,[2] to address whether a veteran can be compensated for limited internal or external rotation of the shoulder under the pre-amendment version of 38 C.F.R. § 4.71a, Diagnostic Code

---

[1] In the same decision, the Board granted entitlement to an increased 20% evaluation for a left knee disability prior to May 18, 2013, and service connection for right knee arthritis. R. at 16-17, 29-30. To the extent that those determinations are favorable to the veteran, the Court will not disturb them. *See Medrano v. Nicholson*, 21 Vet.App. 165, 170 (2007) ("The Court is not permitted to reverse findings of fact favorable to a claimant made by the Board pursuant to its statutory authority."), *aff'd in part, dismissed in part sub nom. Medrano v. Shinseki*, 332 F. App'x 625 (Fed. Cir. 2009). The Board also denied entitlement to an evaluation greater than 60% for lichen planus from February 8, 2016. R. at 27-28. Because Mr. Estevez has not challenged that portion of the Board decision, the appeal as to that issue will be dismissed. *See Pederson v. McDonald*, 27 Vet.App. 276, 281-86 (2015) (en banc) (declining to review the merits of an issue not argued and dismissing that portion of the appeal).

[2] *Estevez v. McDonough*, No. 20-8637, Oral Argument [hereinafter Oral Argument], available at https://www.youtube.com/watch?v=qNzoDYU1DNQ.

(DC) 5201 (limitation of motion of the arm), and whether pain on motion and pain at rest are different manifestations of disability for purposes of assigning separate knee evaluations.

For the reasons that follow, the Court will affirm the portion of the July 2020 Board decision denying an evaluation greater than 20% for a right shoulder disability. The Court will set aside the portions of the Board decision denying evaluations greater than 20% for a left knee disability for the entire period on appeal and greater than 10% for lichen planus prior to February 8, 2016, and remand those matters for readjudication consistent with this decision.

## I. FACTS

Mr. Estevez served on active duty in the U.S. Marine Corps from March 1979 to October 1992, April 1998 to April 1999, May 1999 to September 1999, and October 1999 to September 2001. R. at 4761-65, 4803. The current appeal stems from an April 2010 claim for increased evaluations, *see* R. at 5604, which ultimately led to the award of 20% evaluations for right shoulder and left knee disabilities from April 1, 2010, and a 10% evaluation for lichen planus prior to February 8, 2016, and a 60% evaluation thereafter. *See* R. at 6-7, 3477-81, 3538-41, 4614-22, 5614-33.

### A. Right Shoulder Disability

Mr. Estevez underwent a VA medical examination in June 2010[3] and complained of right shoulder weakness, lack of endurance, tenderness, and pain, with flare-ups of symptoms precipitated by physical activity. R. at 5645. The examiner recorded right shoulder flexion and abduction to 110° with pain at 90°, and internal and external rotation to 80° with pain at 60°. R. at 5647. The veteran reported similar symptoms at an October 2019 VA examination, R. at 1193, but he had decreased right shoulder abduction to 90° and internal rotation to 55°, with pain that caused functional loss in all movements, R. at 1194.

### B. Left Knee Disability

As for the left knee, at the June 2010 examination Mr. Estevez reported weakness, stiffness, warmth, lack of endurance, fatigability, tenderness, and pain, with increased pain on prolonged standing or walking. R. at 5645. He also described flare-ups of symptoms occurring both

---

[3] The examination took place in June 2010, but the report was generated in July 2010. R. at 5645. For clarity's sake, we will refer to this examination as the June 2010 VA examination as the parties do, even though the Board refers to it as the July 2010 examination. *See* R. at 14-16.

spontaneously and with physical activity, which prevented him from running, going up and down stairs, or bending his knees for long periods. *Id*. Range-of-motion tests revealed left knee flexion to 110° with pain but no limitation of extension, including with repetition. R. at 5648.

The veteran was subsequently afforded additional VA knee examinations in July 2012 and June 2014, which also showed no limitation of extension. R. at 4739, 5506. However, at the later examination, he reported frequent episodes of left knee locking and related pain, R. at 4742, and gave the examiner a May 2013 MRI report showing a meniscal tear and Baker's cyst, assessed as "likely due to progression" of his service-connected left knee disability, R. at 4744.

Thereafter, at the October 2019 VA examination, Mr. Estevez reported that he experienced "stiffness all the time," that it was painful to bend the knee, and that the condition prevented him from standing "too long," running, or exercising. R. at 1180. He also complained of severe flare-ups lasting all day that were precipitated by movement, prolonged standing, prolonged sitting, and running. *Id*. Range-of-motion (ROM) tests, which were conducted during a flare-up, revealed left knee flexion to 85° and extension to 10°. R. at 1181. The examiner indicated that there was evidence of pain with flexion and extension, on weight-bearing, on repetitive use, and during flare-ups, all of which pain she described as causing functional loss. R. at 1181-83. And, in the section of the examination report for recording the additional factors that contribute to disability, she checked the boxes for "less movement than normal due to ankyloses, etc.," "interference with sitting," and "interference with standing," and separately typed in "pain." R. at 1184 (capitalization altered).

### C. Lichen Planus

Regarding lichen planus, at the June 2010 VA examination, Mr. Estevez complained of aching pain, severe itching, and widespread rash, which he treated with topical corticosteroids. R. at 5646. The examiner concluded that lichen planus affected 1% of the exposed area and 3% of the entire body. *Id*.

Several years later, during a February 2016 VA dermatology consult, the veteran reported that he had sought private treatment a month earlier for an "exacerbation" of lichen planus and received steroid shots. R. at 640. He told the VA dermatologist that he used a corticosteroid spray (clobetasol) during flare-ups and that he previously used a corticosteroid cream (Lidex) but felt it did not work well. *Id*. The dermatologist prescribed an oral antihistamine (hydroxyzine tablets) and clobetasol ointment. R. at 641.

At a follow-up visit in April 2016, it was noted that the veteran's lichen planus was previously well managed with clobetasol spray and that, although his condition had improved since February 2016, it was "coming back" and "getting worse overall in [the] past few years." R. at 525. An attached medical list included a daily regimen of hydroxyzine tablets. R. at 526. Later that month, a VA examiner noted that Mr. Estevez was using a different oral antihistamine (hydralazine) constantly or near constantly, and clobetasol spray for 6 weeks or more in the past 12 months. R. at 3973. The examiner found that the veteran's lichen planus affected less than 5% of the exposed area of the body and between 5 and 20% of the total body area. R. at 3974.

### D. The July 2020 Board Decision

In the decision currently on appeal, the Board first denied entitlement to a right shoulder evaluation greater than 20% under the then-extant version of DC 5201 because range-of-motion tests from June 2010 and October 2019 revealed abduction limited to 90°. R. at 12. The Board acknowledged that Mr. Estevez's right shoulder disability caused additional functional loss due to pain and an inability to carry heavy objects, but it concluded that a higher evaluation was not warranted because, even factoring in that additional functional loss, his level of disability did not more nearly approximate arm motion limited to midway between the side and shoulder level. *Id.* Although the Board also noted the October 2019 measurement of internal rotation limited to 55°, it did not expressly consider it when denying a higher evaluation under pre-amendment DC 5201. R. at 11-12.

Next, the Board awarded an increased left knee evaluation of 20%[4], but no higher, prior to May 2013 because it found that there was evidence of "additional loss of motion of the left knee joint due to pain or flare-ups of pain" that was "not encompassed in the documented ROM testing during this period." R. at 16. For the period since May 2013, the Board denied an evaluation greater than 20% because it found that the veteran's left knee disability was appropriately evaluated under 38 C.F.R. § 4.71a, DC 5258 (dislocated semilunar cartilage[5]), which provides only a 20% evaluation. R. at 17-18. It also denied entitlement to a separate evaluation under any other knee DC because it found that the evaluation under DC 5258 contemplated his symptoms and functional

---

[4] As discussed in more detail in part III.C below, it is unclear under which DC the Board awarded this increased evaluation.

[5] Semilunar cartilage refers to the knee menisci. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 295 (33d ed. 2020) [hereinafter DORLAND'S].

loss, including "documented symptoms of daily left knee flare-ups . . . precipitated by movement of the joint, prolonged standing, prolonged sitting[,] and running"; pain causing functional loss on weight-bearing and repetition; and "subjectively reported increased levels of pain and swelling." R. at 18.

Finally, the Board denied a lichen planus evaluation greater than 10% under 38 C.F.R. § 4.118, DC 7800 (burn scars) prior to February 8, 2016. R. at 24-27. The Board also determined that the veteran did not meet the criteria for a higher evaluation under DCs 7806 (dermatitis or eczema) or 7822 (papulosquamous disorders not listed elsewhere, including lichen planus) before that date. *Id*. This appeal followed.

## II. RIGHT SHOULDER

### A. Governing Law

We begin with the Board's denial of a right shoulder evaluation greater than 20% under pre-amendment DC 5201. VA's Schedule for Rating Disabilities includes a regulation, 38 C.F.R. § 4.71, that contains written instructions for measuring joint movement, as well as plates that illustrate those movements. Section 4.71 states that "anatomical position"—that is, standing erect with the face, palms, and feet directed straight ahead and the upper limbs at the sides, DORLAND'S at 1476—is generally "considered as 0°" for measurement purposes. 38 C.F.R. § 4.71 (2022). But there is a "major . . . exception[]" to this general rule for measuring shoulder rotation: for that movement, 0° is defined as having the "arm abducted to 90°, elbow flexed to 90° with the position of the forearm reflecting the midpoint 0° between internal and external rotation of the shoulder." *Id*.

This general rule and exception are illustrated in the first three images in Plate I, which depict the ranges of motion for flexion, abduction, and internal and external rotation of the shoulder, respectively:



38 C.F.R. § 4.71, Plate I. Per Plate I, full range of motion for shoulder flexion and abduction is from 0° to 180°, whereas for shoulder internal and external rotation, it is from 0° to 90°. *Id*.

Mr. Estevez's right shoulder disability is currently evaluated as 20% disabling under the 2020 version of § 4.71a, DC 5201.[6] *See* R. at 6, 10-12. That version of the DC provided:

| 5201 Arm, limitation of motion of: | Major | Minor |
|---|---|---|
| To 25° from side……………………………………… | 40 | 30 |
| Midway between side and shoulder level………….. | 30 | 20 |
| At shoulder level…………………………………… | 20 | 20 |

38 C.F.R. § 4.71a, DC 5201 (2020).

The Secretary amended DC 5201, effective February 7, 2021, "to clarify the terminology used in the[] criteria by adding ranges of motion of the shoulder." *Schedule for Rating Disabilities; Musculoskeletal System and Muscle Injuries*, 82 Fed. Reg. 35,719, 35,722 (proposed rule) (Aug. 1, 2017); *see Schedule for Rating Disabilities: Musculoskeletal System and Muscle Injuries*, 85 Fed. Reg. 76,453 (final rule) (Nov. 30, 2020). Specifically, the Secretary added the phrase "flexion and/or abduction" to each evaluation level, as well as corresponding degree measurements. The amended regulation now reads:

---

[6] Mr. Estevez's right shoulder is his "major," or dominant, shoulder. R. at 1193; *see* 38 C.F.R. § 4.69 (2022).

| 5201 Arm, limitation of motion of: | Major | Minor |
|---|---|---|
| Flexion and/or abduction limited to 25° from side…40 | | 30 |
| Midway between side and shoulder level (flexion and/or abduction limited to 45°)……………………30 | | 20 |
| At shoulder level (flexion and/or abduction limited to 90°) …………………………………………..... 20 | | 20 |

38 C.F.R. § 4.71a, DC 5201 (2022). When proposing the amendment, the Secretary emphasized that the changes to DC 5201 were "not intended to alter the rating criteria" but rather were meant to "clarify the specific ranges of motion that qualify as limitations to ensure rating personnel consistently apply these criteria." 82 Fed. Reg. at 35,722.

## B. The Parties' Arguments

As noted above, the Board denied a right shoulder evaluation greater than 20% under pre-amendment DC 5201 because the record evidence showed abduction limited to 90°–that is, at shoulder level. R. at 12. Mr. Estevez argues that the Board, in focusing solely on limitation of abduction, misinterpreted pre-amendment DC 5201 to exclude his limited shoulder internal rotation in violation of *Mariano v. Principi*, 17 Vet.App. 305 (2003), and *Yonek v. Shinseki*, 722 F.3d 1355 (Fed. Cir. 2013).

The veteran's argument is based on simple math. In his view, a 30% evaluation under pre-amendment DC 5201 required limitation midway between side and shoulder level, which he calculates as 45°, and a 20% evaluation required limitation at shoulder level, which he calculates as 90°. He reasons that, because the 2020 version of DC 5201 did not specify any particular type of limited arm motion, the October 2019 VA examiner's finding of internal rotation limited to 55° more nearly approximates the criteria for a 30% evaluation because 55° is numerically closer to 45° than to 90°. Appellant's Brief (Br.) at 20-23; Reply Br. at 8-12; *see also* Motion for Initial Panel Review (Mot. for IPR) at 5-6. He therefore asks the Court to reverse the Board's denial of an evaluation greater than 20% under pre-amendment DC 5201, direct that a 30% evaluation be awarded for his limited shoulder internal rotation, and "remand to address effective date." Appellant's Br. at 23.

The Secretary disputes this contention and urges the Court to affirm this portion of the Board's decision. Secretary's Br. at 14-17. Citing § 4.71, he argues that the veteran is conflating how shoulder flexion and abduction are measured with how internal and external rotation of the shoulder are measured, an interpretation that would lead to absurd results. *Id*. The Secretary also

points to his statement in the *Federal Register* that the 2021 amendment to DC 5201 that added flexion and abduction to the DC was meant to be a nonsubstantive clarification of what the DC has always meant—namely, that the DC applied and continues to apply only to limitation of shoulder flexion and abduction. *Id.* at 16-17.

## C. Analysis

Whether shoulder internal rotation may be evaluated under the 2020 version of DC 5201 is a question of regulatory interpretation that we address de novo. *See Bailey v. Wilkie*, 33 Vet.App. 188, 194 (2021). "Regulatory interpretation begins with the language of the regulation, the plain meaning of which is derived from its text and its structure." *Petitti v. McDonald*, 27 Vet.App. 415, 422 (2015). If the meaning and scope are clear from that investigation, then the plain meaning controls and "that is 'the end of the matter.'" *Tropf v. Nicholson*, 20 Vet.App. 317, 320 (2006) (quoting *Brown v. Gardner*, 513 U.S. 115, 120 (1994)). When genuine ambiguity exists, the Court may look to other sources, including the history and purpose of the regulation containing the DC, to discern its meaning. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019); *Bailey*, 33 Vet.App. at 194-95.

We begin, then, with the text of the pre-amendment version of DC 5201. That version did not contain an express limitation on its scope; the evaluation criteria did not mention any particular shoulder motion or set of motions, and the title was so "generic" that it arguably could have applied to any of the four shoulder motions specified in § 4.71. *Mariano*, 17 Vet.App. at 317. Moreover, unlike pre-amendment DC 5201, the immediately preceding DC (DC 5200) *did* contain an express reference to limitation of abduction, suggesting that the Secretary knew how to and could have included a similar qualifier if he had intended pre-amendment DC 5201 to apply only to certain shoulder motions. 38 C.F.R. § 4.71a, DC 5200 (2020); *see Mariano*, 17 Vet.App. at 317 (making this same observation). But these factors, which appear at first to favor a broad construction of pre-amendment DC 5201 that includes internal and external rotation, cannot be dispositive because the structure of the DC is incompatible with § 4.71's prescribed method for measuring shoulder rotation. *See Spellers v. Wilkie*, 30 Vet.App. 211, 220 (2018) (rejecting an interpretation of a DC that ignored a prefatory regulation and the terms of the DC itself); *see also Foster v. McDonough*, 34 Vet.App. 338, 345 (2021) ("When we assess the meaning of a regulation, we should not read its words in isolation, but rather in the context of the regulatory scheme and structure as a whole.").

8

As noted above, § 4.71 identifies different starting points for measuring shoulder flexion and abduction (from anatomical position as 0°) and for shoulder internal and external rotation (from the position of the "arm abducted to 90°, elbow flexed to 90° with the position of the forearm reflecting the midpoint 0° between internal and external rotation of the shoulder" as 0°). For shoulder flexion and abduction, Plate I depicts movements away from the side of the body in the sagittal and coronal planes, respectively, whereas for shoulder rotation, it depicts movements in the transverse plane around a different axis. 38 C.F.R. § 4.71, Plate I.[7] Plate I also specifies different numeric ranges of motion for shoulder flexion and abduction (0° to 180°) and internal and external rotation (0° to 90°). *Id*. These differences are fatal to Mr. Estevez's proposed interpretation because only the method for measuring shoulder flexion and abduction comports with the pre-amendment evaluation criteria.

Significantly, pre-amendment DC 5201's evaluation levels were defined in relation to shoulder range of motion away from anatomical position in the sagittal and coronal planes, not from the position that § 4.71 designates as 0° for measuring shoulder rotation in the transverse plane. This distinction is critical because, during shoulder rotation, the arm does not pass through DC 5201's reference points—i.e., 25° from side, midway between side and shoulder level, and at

---

[7] For reference, the sagittal plane is a vertical plane running from back to front that divides the body into right and left sides. The coronal plane is a vertical plane perpendicular to the sagittal plane that divides the body into anterior and posterior portions. And the transverse plane is a horizontal plane that divides the body into upper (superior) and lower (inferior) portions. *See* NAT'L INSTS. OF HEALTH, NAT'L CANCER INST., Anatomical Terminology, https://training.seer.cancer.gov/anatomy/body/terminology.html#planes (last visited May 18, 2023).



shoulder level. *See* 38 C.F.R. § 4.71a, DC 5201 (2020). Instead, the upper arm remains *fixed in position relative to the body* while the shoulder rotates and the forearm moves. 38 C.F.R. § 4.71, Plate I.[8] Given this reality, the pre-amendment version of DC 5201 simply cannot be read to address limitation of shoulder internal and external rotation. In fact, if we were to interpret the DC as Mr. Estevez argues, then evaluations for limitation of shoulder rotation under pre-amendment DC 5201 would depend entirely on the starting test position of the arm rather than the actual range of motion. That can't possibly be right.

Mr. Estevez attempts to avoid this conclusion by translating the DC's reference points for shoulder flexion and abduction into numeric degree measurements that could be applied to internal and external shoulder rotation. *See, e.g.*, Appellant's Br. at 23 (arguing that limitation of internal rotation to 55° is numerically closer to the 45° reference point listed in the DC (midway between side and shoulder level) than to the 90° one (at shoulder level)). But the problem with this argument is that the full ranges of motion for flexion and abduction—0° to 180°—are not equal to the full ranges of motion for internal and external rotation of the shoulder—0° to 90°. *See* 38 C.F.R. § 4.71, Plate I. This incongruity means that the veteran's limitation of internal rotation to 55° represents half as much limitation relative to the entire range of motion when compared to flexion or abduction limited to 55°.[9]

Mr. Estevez acknowledges this distinction but asserts that the Secretary's use of "a single set of threshold measurements" in pre-amendment DC 5201 reflects his intent to treat all shoulder motions the same; that is, to assign the same evaluation for numerically equal range of motion measurements regardless of the type of shoulder motion. Reply Br. at 9-10. But that argument is untenable given the structure of the DC, its incompatibility with § 4.71's prescribed method for measuring shoulder rotation, and the lack of support in the DC itself for such disparate treatment of shoulder rotation. As such, the Court must decline to read the DC in such a manner. *See Timex V.I., Inc. v. United States*, 157 F.3d 879, 886 (Fed. Cir. 1998) (invoking the interpretative canon that a "construction that causes absurd results is to be avoided if at all possible").

---

[8] This is true even if the veteran has less than 90° of shoulder abduction and cannot be tested from the starting position set forth in § 4.71. What matters is that shoulder rotation is a movement in the transverse plane and the reference points in pre-amendment DC 5201 are for movements in the sagittal and coronal plane, e.g., flexion and abduction, respectively. *See* 38 C.F.R. § 4.71, Plate I.

[9] If we were to instead treat these different ranges of motion proportionally, then the veteran's internal rotation would need to be limited to one-fourth of the total range of motion, or 22.5°, to more nearly approximate the criteria for a 30% evaluation. Obviously, he has not demonstrated that degree of limitation.

Moreover, contrary to the veteran's contentions, Appellant's Br. at 21-22; Reply Br. at 8, neither *Mariano* nor *Yonek* compels a broader construction. To be sure, both cases contain language that arguably supports his position. But when that language is read in context, it is clearly not dispositive, as neither case answered the interpretative question before us today nor overrides the regulatory framework. The issue in *Mariano*, for example, was whether "either flexion or abduction"—not internal or external rotation— "may be used to satisfy" pre-amendment DC 5201's evaluation criteria. 17 Vet.App. at 317. Although the *Mariano* Court, in rejecting the Secretary's contention that the DC measured abduction only, observed that "Plate I lists, inter alia, both abduction and flexion as shoulder-arm-motion measurements," that DC 5200 "explicitly refers to abduction" but DC 5201 "does not explicitly refer to any specifically identified type of ROM measurement," and that the title of the DC "appears generic and does not specify limitation based on abduction," the Court did not rule on whether the DC applied to internal or external shoulder rotation. *Id*. To the contrary, the Court concluded only that the DC was not limited to shoulder abduction only and remanded the claim for the Secretary to answer a very different question: whether pre-amendment DC 5201 required evidence of "limitation in all planes" or "in any one plane." *Id*. at 317-18.

Likewise, in *Yonek*, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) did not address whether pre-amendment DC 5201 applied to internal or external shoulder rotation; in fact, the Federal Circuit did not mention shoulder rotation at all. The issue presented in *Yonek* was whether veterans could receive separate evaluations under that DC for limitation of shoulder flexion and abduction of the same shoulder. *See Yonek*, 722 F.3d at 1358. The Federal Circuit held that they could not, concluding that the "plain meaning of [DC] 5201 . . . is that any 'limitation of motion of' a single arm at the shoulder joint constitutes a single disability, regardless of the number of planes in which the arm's motion is limited." *Id*. at 1359 (quoting 38 C.F.R. § 4.71a, DC 5201 (2013)). Although this quotation could be read in isolation to support Mr. Estevez's proposed interpretation of pre-amendment DC 5201, the context in which it was written makes clear that the Federal Circuit was simply rejecting the appellant's argument that separate evaluations could be awarded under that DC, not that the DC could be read to encompass any type of limited shoulder motion. *See id*. at 1358 ("The plain language of [§] 4.71a confirms that a veteran is only entitled to a single disability rating under [DC] 5201 for each arm that suffers from limited motion at the shoulder joint."). Thus, Mr. Estevez's reliance on *Mariano* and *Yonek* is misplaced.

In short, although pre-amendment DC 5201 did not specify that it applied only to certain types of arm motions, the language and structure of the DC indicates that it was, in fact, limited to shoulder flexion and abduction. Given that Mr. Estevez argues only that the Board committed reversible error in not awarding a higher right shoulder evaluation under that DC based on his limited shoulder internal rotation, and given that he did not argue that the Board committed any other error in evaluating that disability, the Court will affirm that portion of the Board decision.[10] *See Hilkert v. West*, 12 Vet.App. 145, 151 (1999) (en banc) (holding that the appellant has the burden of demonstrating error), *aff'd per curiam*, 232 F.3d 908 (Fed. Cir. 2000) (table); *Grivois v. Brown*, 6 Vet.App. 136, 138 (1994) (holding that the Court has discretion to deem abandoned issues not argued on appeal).

### III. LEFT KNEE

#### A. Governing Law

We next address the Board's denial of separate evaluations for Mr. Estevez's left knee disability. Three DCs are relevant to this discussion. The first is DC 5258, which provides a 20% evaluation for dislocated semilunar cartilage (meniscus) with frequent episodes of "locking," pain, and effusion into the joint. 38 C.F.R. § 4.71a, DC 5258. The second is DC 5259, which provides a 10% evaluation for symptomatic removal of semilunar cartilage. 38 C.F.R. § 4.71a, DC 5259. And the third is DC 5261, which, in pertinent part, provides a noncompensable evaluation for leg extension limited to 5° and a 10% evaluation for leg extension limited to 10°. 38 C.F.R. § 4.71a, DC 5261.

To determine whether the Board erred in denying Mr. Estevez separate evaluations under a meniscal DC (DCs 5258 and 5259) and DC 5261, we must once again grapple with VA's dual duties to maximize benefits under 38 C.F.R. § 3.103(a), *see Morgan v. Wilkie*, 31 Vet.App. 162, 168 (2019), and to avoid pyramiding under 38 C.F.R. § 4.14. We need not recount the long history of these two precepts of veterans law to decide this appeal.[11] Instead, we focus on two recent

---

[10] Although the Court need not address the issue at this time, we note that the Secretary stated at oral argument that limited shoulder rotation could be evaluated under § 4.71a, DC 5202, and 38 C.F.R. § 4.73, DCs 5302 and 5304. Oral Argument at 57:20-58:15.

[11] *See, e.g., Brady v. Brown*, 4 Vet.App. 203 (1993); *Fanning v. Brown*, 4 Vet.App. 225 (1993). *Esteban v. Brown*, 6 Vet.App. 259 (1994); *Jones v. Principi*, 18 Vet. App. 248 (2004); *Amberman v. Shinseki*, 570 F.3d 1377 (Fed. Cir. 2009); *Perciavalle v. McDonough*, 35 Vet.App. 11 (en banc) (2021).

cases—*Lyles v. Shulkin*, 29 Vet.App. 107 (2017), and *Walleman v. McDonough*, 35 Vet.App. 294 (2022)—that addressed when it is appropriate to award separate evaluations for knee disabilities under a meniscal DC and another knee DC.

Our consideration of these cases begins with the well-established principle that, although disabilities arising from a single disease entity are ordinarily evaluated separately, 38 C.F.R. § 4.25(b) (2022), VA may not compensate a veteran more than once for the same disability or manifestation of disability, 38 C.F.R. § 4.14. As we explained in *Lyles*, "entitlement to a separate evaluation in a given case depends on whether the manifestations of disability for which a separate evaluation is being sought have already been compensated by an assigned evaluation under a different DC"; if they haven't, evaluation of those manifestations under another DC would not constitute pyramiding. 29 Vet.App. at 107, 118. The *Lyles* Court held that evaluation of a meniscal disability under DC 5258 or 5259 did not preclude, as a matter of law, providing a separate evaluation for the same knee under a limitation of motion DC such as DC 5261. *Id*. at 115. In so holding, the Court rejected the Secretary's argument that DCs 5258 and 5259 are so broadly drawn as to necessarily encompass and compensate limitation of motion of the same knee. *Id*. at 113. Instead, the relevant inquiry for pyramiding purposes is whether the manifestations that form the basis of the already assigned evaluation are distinct and separate from those that would form the basis of a separate evaluation. *Id*. at 118 (citing *Murray v. Shinseki*, 24 Vet.App. 420, 423 (2011)).

The Court expounded on that reasoning in *Walleman*, holding that the rule against pyramiding does not categorically prohibit providing separate evaluations for residuals of a meniscectomy (surgical removal of meniscal cartilage) under DC 5259 and lateral instability of the knee under 38 C.F.R. § 4.71a, DC 5257. 35 Vet.App. at 303-07. The *Walleman* Court explained that the duty to maximize benefits requires VA to assign a separate evaluation under DC 5257 for lateral instability of the knee if the veteran is assigned an evaluation under DC 5259 for meniscectomy symptoms that do not include lateral instability. *Id*. at 306. The Court stressed that "this way of approaching the situation is not rating individual symptoms, but instead is evaluating distinct manifestations from the same injury." *Id*. at 305.

Taken together, *Lyles* and *Walleman* direct VA, when considering the appropriate evaluation under a meniscal DC, to catalog a veteran's manifestations of a service-connected knee disability and the resulting functional impairment and assign all independently supportable knee evaluations that correspond with these manifestations. *See id*.; *Lyles*, 29 Vet.App. at 119

(remanding because the Board, in denying a higher evaluation under DC 5261 and a separate evaluation under DCs 5258 or 5259, had not adequately addressed whether the veteran's currently assigned knee evaluations compensated him for documented manifestations of knee swelling, popping, locking, and grinding).

## B. The Parties' Arguments

With these guiding principles in mind, we return to Mr. Estevez's case. The Board found that Mr. Estevez experiences left knee pain during physical activity and with prolonged sitting and standing. R. at 16, 18. The veteran characterizes this as a favorable finding that his service-connected left knee disability causes pain both "on motion" and "other than on motion." Appellant's Br. at 17. He thus argues that the Board erred in denying him a separate evaluation for limitation of extension under DC 5261 because it erroneously applied all of his left knee pain — both at rest and on motion—to the 20% evaluation under DC 5258 in violation of VA's duty to maximize benefits. According to Mr. Estevez, his pain at rest was sufficient to satisfy DC 5258's pain requirement, leaving his pain on motion unaccounted for and available to establish a compensable limitation of extension under DC 5261. Appellant's Br. at 12-20; Reply Br. at 1-8; *see also* Mot. for IPR at 1-5. He therefore requests that the Court reverse the Board's denial of separate evaluations and direct the Board to award a 10% evaluation under DC 5261 effective no later than June 30, 2010. Appellant's Br. at 20; Reply Br. at 8. In the alternative, he asks the Court to set aside that portion of the Board decision and remand for the Board to reassess the issue. Appellant's Br. at 20; Reply Br. at 8.

The Secretary responds that "pain is pain" and urges the Court to affirm the Board's evaluation of the veteran's left knee disability because the Board's finding that DC 5258 contemplated all his left knee symptoms was plausible and supported by adequate reasons or bases. Secretary's Br. at 9-14. In his supplemental memorandum of law, the Secretary reiterates his position that pain at rest and pain on motion are not distinct manifestations of disability and asserts that the Board's analysis in this regard was consistent with *Lyles* and *Walleman*. Secretary's Supplemental Memorandum of Law at 1-5.

## C. Analysis

The goal of the rating schedule is to compensate veterans for their level of functional impairment, the diminished "ability of the body as a whole, or of the psyche, or of a system or organ of the body to function under the ordinary conditions of daily life[,] including employment."

14

38 C.F.R. § 4.10 (2022); *see* 38 C.F.R. § 4.1 (2022) ("The percentage ratings represent as far as can practicably be determined the average impairment in earning capacity resulting from such diseases and injuries and their residual conditions in civil occupations."). Both Congress and VA treat pain as "a form of functional impairment," *Saunders v. Wilkie*, 886 F.3d 1356, 1364-65 (Fed. Cir. 2018), and the rating schedule accounts for the disabling effects of pain in various ways. *See, e.g.*, *id.* at 1364; *Thompson v. McDonald*, 815 F.3d 781, 785-86 (2016); *Lyles*, 29 Vet.App. at 117-18; *Southall-Norman v. McDonald*, 28 Vet.App. 346, 352 (2016); *Mitchell v. Shinseki*, 25 Vet.App. 32, 36-37 (2011); *DeLuca v. Brown*, 8 Vet.App. 202, 205-07 (1995) (each discussing the myriad of rating provisions, including 38 C.F.R. §§ 4.40, 4.45, and 4.59, that provide for evaluation of pain).

But the rating schedule does not allow compensating the same manifestation of disability more than once. *See Lyles*, 29 Vet.App. at 118 ("[T]he aim of the rating schedule is to ensure that a claimant is properly compensated, but not overcompensated, for the actual level of impairment."); *Brady*, 4 Vet.App. at 206 (holding that "compensating a claimant twice (or more) for the same symptomatology" is impermissible because "such a result would overcompensate the claimant for the actual impairment of [] earning capacity"). That includes "making multiple awards for the same physical impairment simply because that impairment could be labeled in different ways." *Amberman*, 570 F.3d at 1380. With respect to knee disabilities, *Lyles* and *Walleman* make clear that assigning separate evaluations under a meniscal DC and another knee DC is appropriate only when doing so would not double compensate any of the same manifestations of disability. *See Walleman*, 35 Vet.App. at 302; *Lyles*, 29 Vet.App. at 117-18. But that is precisely what the veteran is asking the Court to do here.

Significantly, although Mr. Estevez characterizes his left knee pain with movement and on prolonged sitting and standing as distinct manifestations capable of being separately evaluated, they are the same manifestation of pain arising under different circumstances. Not only is this conclusion intuitive, as Mr. Estevez experiences the same disabling manifestation—pain—when he moves his left knee and when he does not, but it is also consistent with the manner in which the Court has treated other manifestations of disability presenting in different contexts as a single manifestation for evaluation purposes. For example, in *Doucette v. Shulkin*, 28 Vet.App. 366, 369-371 (2017), the Court characterized "the inability to hear or understand speech or to hear other sounds in various contexts"—including "difficulty in distinguishing sounds in a crowded

15

environment, locating the source of sounds, understanding conversational speech, hearing the television, and using the telephone"—as "hearing loss" for schedular evaluation purposes. Although the focus of *Doucette* was extraschedular evaluation and hearing loss, the animating principle underlying that case—namely, that a veteran should not be overcompensated for the actual level of impairment simply because hearing loss could be described differently when experienced in different circumstances—applies with equal force to separate evaluation and pyramiding. Indeed, characterizing pain at rest and pain on motion as a single manifestation of pain comports with the Court's guidance in *Walleman* that the rating schedule should be used to evaluate "distinct manifestations from the same disability," not to double-compensate "individual symptoms" simply because they could be described in a way that satisfies multiple DCs. 35 Vet.App. at 305.

A comparison to one of the Court's seminal separate evaluation cases helps underscore this point. In *Esteban*, the Court held that the veteran's facial disfigurement, painful scars, and muscle damage causing problems with mastication were separate manifestations of a single service-connected facial injury because none of those manifestations were "duplicative of or overlapping with the symptomatology of the other two." 6 Vet.App. at 262. Unlike the manifestations of Mr. Esteban's facial injury, Mr. Estevez's pain at rest and pain on motion are not "distinct and separate;" they are both pain. *Id*. That factor is fatal to Mr. Estevez's argument, as he concedes that pain is a necessary component of the evaluations he is seeking under DCs 5258 and 5261. *See* Appellant's Br. at 17 (stating that the "minimum relevant symptomatology" for compensable evaluations under DCs 5258 and 5261 are his "pain on motion" and "his pain other than on motion," respectively).

The critical point is that the rating schedule does not allow for evaluation of the same manifestation presenting in different circumstances. 38 C.F.R. § 4.14; *see Amberman*, 570 F.3d at 1380; *Brady*, 4 Vet.App. at 206. This is true despite the fact that VA regulations sometimes refer simply to pain and other times contextualize its presentation. *See* Reply Br. at 4-5 (collecting examples). In the end, it is "the veteran's overall disability that is relevant." *Amberman*, 570 F.3d at 1380-81, and treating pain as a single manifestation of disability safeguards against compensating veterans beyond their actual level of impairment simply because pain arises in different circumstances. We therefore reject Mr. Estevez's argument that pain at rest and pain on motion are distinct manifestations of a disability that VA must separately evaluate under a meniscal DC and a limitation of motion DC, respectively.

Nevertheless, the Court concludes that remand is warranted because the Board did not provide adequate reasons or bases for denying a higher left knee evaluation for either period on appeal. For the period prior to May 18, 2013, it is unclear under what DC the Board awarded an increased 20% evaluation. In its conclusions of law, the Board lists DC 5259 as the basis for the award, R. at 6, but that DC does not have a 20% evaluation level. *See* 38 C.F.R. § 4.71a, DC 5259. At oral argument, the parties asserted that the Board awarded the increased 20% evaluation under DC 5258, which does provide for a 20% evaluation, Oral Argument at 4:05-5:15, 45:00-45:56, but the Board did not discuss that DC or even reference its specific criteria when deciding that the evidence was in relative equipoise as to an award of a 20% evaluation prior to May 2013. *See* R. at 16-17. In fact, the only mention of DC 5258 for this period is in the paragraph of the Board's analysis where it denied entitlement to "separate or higher" evaluations under that DC and others. R. at 17.

Contrary to the parties' suggestion, it appears that the Board may have awarded the increased evaluation under one of the limitation of motion DCs, either 38 C.F.R. § 4.71a, DC 5260 (limitation of flexion) or 5261 (limitation of extension). As a hint of this, the Board cited the June 2010 VA examination and stated:

> When considering the *DeLuca* criteria, this medical evidence is probative of additional loss of motion of the left knee joint due to pain or flare-ups of pain. The veteran has specifically described functional loss due to pain not encompassed in the documented ROM testing during this period which warrants a 20[%] rating, but no higher.

R. at 16 (capitalization altered). But even that finding is not clear from the Board decision or the current evidence of record, as the June 2010 VA examination does not contain range of motion test results that obviously support a 20% evaluation for limitation of left knee flexion or extension even with pain, *see* R. at 5648, and the Board did not further clarify its finding. Absent a clear statement of the reasons or bases for the award of the increased 20% left knee evaluation prior to May 18, 2013, the Court cannot determine whether the Board properly denied a higher or separate evaluation for that period. Its reasons or bases for that denial are therefore inadequate. *See Gilbert v. Derwinski*, 1 Vet.App. 49, 56-57 (1990) (holding that, to comply with 38 U.S.C. § 7104(d)(1), the Board must support its material determinations of fact and law with adequate reasons or bases that enable the claimant to understand the precise basis for those determinations and facilitate judicial review).

17

The same is true for its denial of a separate left knee evaluation since May 18, 2013. The Board did not list limited left knee extension among the symptoms it found to be covered by Mr. Estevez's 20% evaluation under DC 5258, nor did it explain how limited extension overlapped with or was duplicative of the frequent episodes of locking, pain, and effusion into the joint that DC 5258 expressly contemplates. R. at 18. In fact, the only mention of left knee extension in the Board's analysis of this period was its finding that the record did not reflect extension limited to 20° sufficient to warrant a higher 30% evaluation, not in its analysis of the veteran's entitlement to a separate evaluation. R. at 17-18. Moreover, the Board failed to make findings of fact as to how pain factored into the veteran's limitation of extension documented at the October 2019 VA examination, *see* R. at 18, and the examination report is not entirely clear on this point, *see* R. at 1180-84. The Board's failure to adequately assess that evidence and make the factual findings necessary to determine whether the veteran was entitled to a separate left knee evaluation since May 18, 2013, frustrates judicial review of that issue. *See Caluza v. Brown*, 7 Vet.App. 498, 506 (1995) (requiring the Board to analyze the credibility and probative value of evidence, account for evidence that it finds persuasive or unpersuasive, and provide reasons for its rejection of material evidence favorable to the claimant), *aff'd per curiam*, 78 F.3d 604 (Fed. Cir. 1996) (table); *Fanning*, 4 Vet.App. at 231 ("When the Board finds appellant is not entitled to a separate rating for a disability due to pyramiding, the decision must include an explanation of the [Board]'s reasons for so concluding according to the applicable law and regulations.").

Given the foregoing, the Court concludes that remand of the left knee claim is warranted for both periods on appeal. *See Tucker v. West*, 11 Vet.App. 369, 374 (1998) (holding that remand is the appropriate remedy "where the Board has incorrectly applied the law, failed to provide an adequate statement of reasons or bases for its determinations, or where the record is otherwise inadequate"). But, to be clear, Mr. Estevez would not be entitled to a separate left knee evaluation under DC 5261 if, to reach a compensable evaluation level under that DC, he needed to rely on painful motion that is already being compensated under DC 5258. *See Lyles*, 29 Vet.App. at 118-19. The Court is remanding for the Board to adequately assess whether he has a compensable degree of limitation of extension independent of the pain that is being compensated under DC 5258, which could support entitlement to a separate evaluation under DC 5261. *See Walleman*, 35 Vet.App. at 306.

18

## IV. LICHEN PLANUS

Finally, we turn to the parties' dispute over the Board's denial of a lichen planus evaluation greater than 10% prior to February 8, 2016. Although Mr. Estevez's lichen planus is evaluated for this period based on characteristics of disfigurement under DCs 7800 and 7822, *see* R. at 25, 157, the veteran argues that the Board erred in not adequately addressing record evidence that may support a higher evaluation under DC 7806, Appellant's Br. at 24-26; Reply Br. at 12-15; Mot. for IPR at 5-7.

Prior to August 13, 2018, DC 7806 provided three methods for evaluating dermatitis or eczema, based on (1) the percentage of the entire body or exposed area of the body affected; (2) the type and frequency of the therapy required; or (3) the number of characteristics of disfigurement present. 38 C.F.R. § 4.118, DC 7806 (2017).[12] The parties' arguments center on the second evaluation method, which provided a noncompensable evaluation for "no more than topical therapy required during the past 12-month period," a 10% evaluation for "intermittent systemic therapy such as corticosteroids or other immunosuppressive drugs required for a total duration of less than six weeks during the past 12-month period," a 30% evaluation for "systemic therapy such as corticosteroids or other immunosuppressive drugs required for a total duration of six weeks or more, but not constantly, during the past 12-month period," and a 60% evaluation for "constant or near-constant systemic therapy such as corticosteroids or other immunosuppressive drugs required during the past 12-month period." *Id*.

Mr. Estevez specifically asserts that the Board overlooked evidence that suggests that he required systemic therapy for his skin condition before February 8, 2016, the date of the VA dermatology consult upon which his increased 60% evaluation under DC 7806 is based. Appellant's Br. at 24-26. The Secretary defends the Board's denial on the ground that "there is no evidence that any physician prescribed or otherwise informed [the veteran] that systemic therapy

---

[12] Effective August 13, 2018, § 4.118 was amended to add a General Rating Formula for the Skin applicable to DCs 7806, 7809, 7813-16, 7820-22, and 7824. *See Schedule for Rating Disabilities; Skin*, 83 Fed. Reg. 32,592 (final rule) (July 13, 2018). The General Rating Formula is similar to DC 7806's prior evaluation criteria in many respects, but one relevant difference is that the General Rating Formula is preceded by a provision that clarifies that "systemic therapy is treatment that is administered through any route (orally, injection, suppository, intranasally) other than the skin, and topical therapy is treatment that is administered through the skin." 38 C.F.R. § 4.118(a) (2022). Despite this clarification, the Secretary explained that claims like Mr. Estevez's that were "pending prior to the effective date [of the amendment] will be considered under both old and new rating criteria, and whatever criteria is more favorable to the veteran will be applied." 83 Fed. Reg. at 32,592. Accordingly, the Board evaluated Mr. Estevez's lichen planus under both versions of DC 7806. R. at 24-27.

19

was necessary for treatment of his skin condition before February 8, 2021." Secretary's Br. at 19. Mr. Estevez responds by challenging the Secretary's interpretation of DC 7806, arguing that it is not necessary that systemic therapy be prescribed to be "required" under that DC. Reply Br. at 12-15; Mot. for IPR at 5-7.

Although the parties disagree on this definitional question, the Court need not answer it today because the Board's failure to address potentially favorable record evidence is a threshold error that frustrates judicial review. In this regard, the Board determined that Mr. Estevez was not entitled to an evaluation greater than 10% under DC 7806 prior to February 8, 2016, because a preponderance of the evidence weighed against a finding that his skin disability required systemic therapy for that period. R. at 26. The Board based that determination solely on the July 2010 VA skin examiner's notations that the veteran's lichen planus affected 3% of his whole body and that he had been prescribed various topical corticosteroid creams to treat that condition. *Id*. However, the Board did not address the veteran's February 2016 statement to a VA dermatologist that he had received steroid shots from a private dermatologist "1 month ago" to treat his increased lichen planus symptoms, R. at 640, or the other record evidence reflecting that topical treatments had been ineffective in the past, R. at 525, 640. Because that evidence may show that Mr. Estevez required constant or near-constant systemic therapy before the date of the February 2016 VA dermatology consult upon which his increased 60% evaluation was based, the Board was required to address it in determining whether he was entitled to a higher evaluation prior to that date.[13] *See Caluza*, 7 Vet.App. at 506.

As we have said before, the Board errs when it reflexively assigns the date of a VA examination as the date of an increased evaluation; instead, the Board must analyze the examination report alongside the other lay and medical evidence of record to determine when an increase in disability actually occurred. *See Swain v. McDonald*, 27 Vet.App. 219, 224-25 (2015) (rejecting the mechanical assignment of an effective date based on the date of examination and explaining that, for staged evaluation purposes, VA must examine all relevant facts to determine

_____

[13] To the extent that the Secretary attempts to excuse the Board's failure to address the veteran's statements that he received steroid shots for his lichen planus prior to February 2016 on the ground that those shots would not constitute constant or near-constant systemic therapy under DC 7806, Secretary's Br. at 20, the Board did not make that factual finding and the Court is not permitted do so in the first instance. *See Tadlock v. McDonough*, 5 F.4th 1327, 1337 (Fed. Cir. 2021) (holding that the Court's statutory duty to consider prejudicial error "does not give it the right to make de novo findings of fact or otherwise resolve matters that are open to debate"); *Hensley v. West*, 212 F.3d 1255, 1263 (Fed. Cir. 2000) ("[A]ppellate tribunals are not appropriate fora for initial fact finding.").

when an increase in a veteran's disability manifests); *DeLisio v. Shinseki*, 25 Vet.App. 45, 58 (2011) ("[A]n effective date should not be assigned mechanically based on the date of a diagnosis. Rather, all of the facts should be examined to determine the date that [a disability] first manifested."). The Board's failure to do so here rendered inadequate its reasons or bases for denying a higher lichen planus evaluation for the period before February 8, 2016. *See Gilbert*, 1 Vet.App. at 56-57. Remand of this issue is therefore warranted. *See Tucker*, 11 Vet.App. at 374.

## V. CONCLUSION

Upon consideration of the foregoing, the portion of the July 23, 2020, Board decision denying an evaluation greater than 20% for a right shoulder disability is AFFIRMED. The portions of the Board decision denying evaluations greater than 20% for a left knee disability for the entire period on appeal and greater than 10% for lichen planus prior to February 8, 2016, are SET ASIDE, and those matters are REMANDED for readjudication consistent with this decision. The balance of the appeal is DISMISSED.